J-S20025-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHRISTIAN WOODSON | : | |
| | : | |
| Appellant | : | No. 1522 MDA 2017 |

Appeal from the Judgment of Sentence July 12, 2017
In the Court of Common Pleas of Lancaster County
Criminal Division at No(s):  CP-36-CR-0005302-2016

BEFORE:  GANTMAN, P.J., OTT, J., and KUNSELMAN, J.

MEMORANDUM BY OTT, J.:                              **FILED JUNE 20, 2018**

Christian Woodson appeals from the judgment of sentence imposed July 12, 2017, in the Lancaster County Court of Common Pleas.  The trial court sentenced Woodson to an aggregate term of four and one-half to 10 years' imprisonment, following his jury conviction of possession with intent to deliver ("PWID") controlled substances and criminal conspiracy.[1]  On appeal, Woodson challenges only the sufficiency of the evidence supporting his conspiracy conviction.  For the reasons below, we affirm.

The facts underlying Woodson's arrest and conviction, as developed during Woodson's jury trial, are summarized by the trial court as follows:

> In the present case, Officer Jared Snader ("Snader"), LCBP, testified that on February 26, 2016, he was working undercover driving in the area of Queen and Conestoga Streets in Lancaster

---

[1] **_See_** 35 P.S. § 780-113(a)(30) and 18 Pa.C.S. § 903, respectively.

City targeting street-level drug sales. At the time of the investigation, this was "the single worst drug area in Lancaster City, especially for heroin." Snader told the jury that he had been an officer for ten years, he was assigned to a special unit designed to investigate drug-related issues, he received special training for drug investigations, and he had been involved in over one thousand drug investigations. According to Snader, most transactions involve a middleman who hangs out in high drug areas, accepts money from the buyer, and then meets up with a supplier who provides the drugs. This process isolates the supplier from dealing directly with people they do not know, while the middleman gets to keep some of the money or drugs. Without going through a middleman, it would be very difficult to purchase drugs.

Regarding this specific transaction, Snader testified that he and Officer Adam Flurry ("Flurry"), LCBP, were driving together in a vehicle when Flurry made contact with an individual later identified as Santiago-Rivera, at which time Flurry had a conversation with Santiago-Rivera about purchasing heroin. Santiago-Rivera got into the undercover vehicle and told Snader where to drive, while Flurry gave Santiago-Rivera $40 of previously marked United States currency. Santiago-Rivera asked to borrow Flurry's phone, and Snader testified that he heard buttons being pressed which sounded as if Santiago-Rivera was sending text messages.

Santiago-Rivera directed Snader to pull over in front of Save-A-Lot, where Santiago-Rivera began placing phone calls. Snader testified "[i]t was obvious to me at that point that he was a middleman. He didn't have [the heroin] on him. He was contacting somebody to come and bring the heroin for us." Santiago-Rivera called his contact several times, giving his location over the phone. Santiago-River[a] then directed Snader to drive to the Andromeda Grocery, where Santiago-Rivera said he was going to get change. Flurry had given Santiago-Rivera two $20 bills, and Snader believed Santiago-Rivera wanted change so he could keep $10 for himself. When Santiago-Rivera exited the store, he placed several more phone calls with his contact. During the phone calls, Santiago-Rivera informed his contact that he was waiting in a van and described the vehicle.

Snader then observed an individual, later identified as [Woodson], walk towards their location and stop to meet with Santiago-Rivera. Santiago-Rivera and [Woodson] talked for about

30 seconds, standing approximately one foot apart. Santiago-Rivera then reached his left arm towards [Woodson], [Woodson] extended his arm, and it appeared as if they were exchanging something. When Santiago-Rivera broke contact with [Woodson], Snader could see that [Woodson] had money in his hands that he was counting as he walked away. It was light out, and from his training and experience Snader testified this was "absolutely a hand-to-hand drug transaction." Santiago-Rivera got back into the undercover vehicle, at which time Flurry stated the deal was complete and Santiago-Rivera was dropped off at another location. [Woodson] was then stopped by another officer under a ruse so they could verify his identity. After testifying about the transaction, Snader identified [Woodson] in the courtroom as the individual who conducted the hand-to-hand transaction with Santiago-Rivera.

In addition to Snader, Officer Flurry testified about his assignment to the Selective Enforcement Unit, the extensive training he has received in drug investigations, and his involvement in over one thousand such investigations[, including the role of a middleman in those transactions]. ....

Regarding this specific incident, Flurry testified that while he and Snader were driving in a high drug activity area of the city, Flurry saw a person later identified as Santiago-Rivera walking in the street. Flurry had a conversation with Santiago-Rivera about purchasing heroin, and Santiago-Rivera stated he could assist Flurry. Santiago-Rivera got into the vehicle, at which time Flurry gave him $40 of United States currency. Santiago-Rivera asked for Flurry's cell-phone, Flurry gave it to him, and Flurry then heard Santiago-Rivera send text messages. Later, upon reviewing the text messages, Flurry saw they were written in Spanish to a person who was not available.

At some point, Santiago-Rivera made a telephone call and cryptically spoke to the other person in broken English, asking where the person was. Santiago-Rivera then made a series of additional calls, and it was later determined by Flurry while inspecting the phone that they were all made to the same phone number. That number could not be traced. Thereafter, Santiago-Rivera met with an individual on the sidewalk, but Flurry could not see what occurred because they were out of his field of vision. When Santiago-Rivera returned to the car, he handed Flurry the heroin. Flurry later gave the packets of suspected heroin to Officer Jason Hagy ("Hagy").

- 3 -

Officer Hagy, LCBP, also a member of the Selective Enforcement Unit, detailed his training and experience in drug investigations. On February 26, 2016, Hagy was the primary surveillance officer in charge of this investigation, traveling in a separate vehicle. During the surveillance, Hagy witnessed Santiago-Rivera meet up with another individual that Santiago-Rivera obviously knew. Hagy saw Santiago-Rivera retrieve something with his left hand and stick it in his left jacket pocket, while the other person was manipulating what appeared to be paper currency. This interaction was indicative of a drug transaction. Hagy identified [Woodson] in court as the person who came into contact with Santiago-Rivera.

Trial Court Opinion, 11/21/2017, at 5-9 (record citations and footnotes omitted).

Woodson was later arrested and charged with PWID, criminal conspiracy and criminal use of a communication facility.[2] His case proceeded to a jury trial, and on April 13, 2017, the jury found him guilty of PWID and conspiracy. Woodson was acquitted of the charge of criminal use of a communication facility. On July 12, 2017, the trial court sentenced him to consecutive terms of 27 months' to five years' imprisonment on each count, for an aggregate term of four and one-half to 10 years' incarceration. Woodson filed a timely post-sentence motion challenging the weight and sufficiency of the evidence supporting his conviction, an evidentiary ruling, and the court's imposition of consecutive sentences. He filed a supplemental motion on July 26, 2017, raising another sentencing challenge. On September 1, 2017, the trial court

_____

[2] **See** 18 Pa.C.S. § 7512(a).

entered two orders, denying both of Woodson's post-sentence motions. This timely appeal followed.[3]

The sole issue Woodson raises on appeal is a challenge to the sufficiency of the evidence sustaining his conviction of criminal conspiracy. Our standard of review is well-settled:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Irvin***, 134 A.3d 67, 75–76 (Pa. Super. 2016) (quotation omitted).

---

[3] On October 2, 2017, the trial court ordered Woodson to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Woodson complied with the court's directive and filed a concise statement on October 23, 2017.

To convict a defendant of criminal conspiracy pursuant to 18 Pa.C.S. § 903, the Commonwealth must prove three elements beyond a reasonable doubt:

> (1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another (a "co-conspirator") to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime.

*Commonwealth v. Murphy*, 844 A.2d 1228, 1238 (Pa. 2004). Although a defendant's mere association with a perpetrator or mere presence at the scene of a crime is insufficient to establish a conspiratorial agreement,

> [d]irect evidence of the defendant's criminal intent or the conspiratorial agreement [] is rarely available. Consequently, the defendant's intent as well as the agreement is almost always proven through circumstantial evidence, such as by "the relations, conduct or circumstances of the parties or overt acts on the part of the co-conspirators." Once the trier of fact finds that there was an agreement and the defendant intentionally entered into the agreement, that defendant may be liable for the overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act.

*Id.* (internal citations omitted).

In the present case, Woodson insists the record is "simply devoid of any direct or circumstantial evidence that [he] had any agreement with Santiago-Rivera to deliver heroin to the undercover officers," or that Santiago-Rivera was purchasing the heroin for anyone but himself. Woodson's Brief at 12. He emphasizes there was no testimony that he saw Santiago-Rivera exit the officers' vehicle or return to it after the purchase, nor did any of the telephone conversations or text messages alert Woodson that Santiago-Rivera was

- 6 -

acting as a "middleman" to purchase drugs for someone else. ***See id.*** Indeed, Woodson argues the Commonwealth relied "heavily" on the undercover officers' experience purchasing narcotics though the use of a middleman. ***See id.*** at 13. However, he points out that even if Santiago-Rivera was a middleman in the transaction, the Commonwealth failed to present sufficient evidence to demonstrate that Woodson knew he was. ***See id.*** Accordingly, Woodson maintains the evidence was insufficient to support his conspiracy conviction.

The trial court determined, however, the Commonwealth established, circumstantially, that Santiago-Rivera and Woodson "made an agreement for Santiago-Rivera to deliver [] heroin to a third party," with Santiago-Rivera "acting as the middleman for [Woodson.]" Trial Court Opinion, 11/21/2017, at 9. The court explained:

> [Officer] Snader testified that he has been involved in over one thousand drug investigations. Most of those transactions involved a middleman who hangs out in high drug areas, accepts money from the buyer, and then meets up with a supplier who provides the drugs. This process isolates the supplier from dealing directly with people they do not know, while the middleman gets to keep some of the money or drugs. In this case, officers located Santiago-Rivera in a high drug-trafficking area, and Santiago-Rivera agreed to serve as the middleman. Santiago-Rivera got into the undercover vehicle and made numerous calls to [Woodson], making arrangement for the delivery of heroin. It was obvious to officers that [Woodson] and Santiago-Rivera knew each other prior to this transaction. Santiago-Rivera described for [Woodson] the vehicle he was in while waiting for the delivery. [Woodson] then traveled to that location and met privately with Santiago-Rivera for thirty seconds before making the delivery of heroin.

Trial Court Opinion, 11/21/2017, at 9-10. The court noted the series of phone calls Santiago-Rivera made were all to the same phone number, although that number could not be traced. Furthermore, after Santiago-Rivera reached out *via* telephone, Woodson arrived at the designated location with narcotics. The court found the actions of Woodson and Santiago-Rivera circumstantially established that Santiago-Rivera acted as a middleman for Woodson's drug sale.

In support of its ruling, the trial court relied upon the Pennsylvania Supreme Court's decision in ***Murphy***, ***supra***, in which the Court held a middleman could be convicted of conspiracy when he screened potential buyers before introducing them to the drug dealer. ***See Murphy***, 844 A.2d at 1238-1239. Woodson asserts, however, the court's reliance on ***Murphy*** is "misplaced" because, in that case, the defendant was "actually the middle[]man who was setting up the deal," and all three men – the middleman, the buyer, and the dealer – were standing together during the sale. Woodson's Brief at 13-14. He argues that, here, however, "[t]here was no evidence that [he] had any reason to believe the individual he gave the drugs to was not going to personally use them." ***Id.*** at 15.

We agree the facts presented in ***Murphy*** are distinguishable from those presented herein, particularly because the defendant in that case was the middleman and not the drug dealer. Nevertheless, we find this Court's decision in ***Commonwealth v. Little***, 879 A.2d 293 (Pa. Super. 2005), *appeal denied*, 890 A.2d 1057 (Pa. 2005), to be instructive.

In **Little**, as here, an undercover officer approached a middleman to purchase cocaine. The middleman told the officer he "had a source for cocaine and could procure from the source 1 ½ grams." **Id.** at 299. When the officer agreed to the purchase, the middleman called his source, whom he referred to as "Mikal or MC Hale." **Id.** The officer then provided the middleman $80.00 for the deal, and the middleman walked to a nearby residence. He knocked on the door and then entered, remaining only thirty seconds to a minute before leaving again. **See id.** The middleman immediately returned to the officer and handed him a ziplock baggie containing cocaine. Approximately 15 minutes later, a surveillance officer observed the defendant leave the residence where the exchange took place. The next day, officers executed a search warrant at the residence, which they confirmed was the defendant's home, and recovered over a half-pound of cocaine. **See id.**

On appeal, the defendant challenged, *inter alia*, the sufficiency of the evidence supporting his conviction of conspiracy. In concluding the evidence was sufficient, the panel opined:

> The above-described conduct constitutes sufficient circumstantial evidence of a conspiracy in which the black male [middleman] and [the defendant] were jointly involved in a drug dealing operation. It is a fair inference that the "Mikal or MC Hale" the black male called was [the defendant], whose first name is Michael. This is an eminently reasonable inference given that the black male proceeded to [the defendant's] residence directly after making the call, the purpose of which was to obtain cocaine. Furthermore, [the defendant] was observed leaving his residence shortly after the black male departed and a large quantity of cocaine was recovered from the residence the very next day.

***Id.***

The facts presented in the case *sub judice* are strikingly similar. Here, the officers approached Santiago-Rivera about purchasing heroin. Santiago-Rivera then entered the officers' vehicle and borrowed a phone to contact a source. He made several calls to the same number, and provided that contact with his location and a description of the officers' vehicle. Shortly thereafter, Woodson walked towards their location, and Santiago-Rivera greeted him. The two men subsequently engaged in a drug transaction. As in ***Little***, while there was no direct evidence that Woodson (the dealer) knew Santiago-Rivera was purchasing the drugs for a third party, the circumstantial evidence supported an inference that Santiago-Rivera was acting as a middleman for Woodson. Accordingly, we agree with the conclusion of the trial court that the evidence was sufficient to support Woodson's conviction of criminal conspiracy.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/20/2018